1
2
3
4
5
6
7
8

9                    **UNITED STATES DISTRICT COURT**

10                   EASTERN DISTRICT OF CALIFORNIA

11

12   CARLOYN S. HUNT,                        Case No.  1:13-cv-01999-SKO

13                 Plaintiff,                **ORDER ON PLAINTIFF'S COMPLAINT**

14        v.                                 (Doc. Nos. 15, 24)

15   CAROLYN W. COLVIN,
16   Acting Commissioner of Social Security,

17                 Defendant.

18
     _____
19

20                         **INTRODUCTION**

21        Plaintiff Carolyn Hunt ("Plaintiff") seeks judicial review of a final decision of the

22   Commissioner of Social Security (the "Commissioner" or "Defendant") denying her application

23   for Supplement Security Income ("SSI") benefits pursuant to Title XVI of the Social Security Act.

24   42 U.S.C. § 405(g).

25        Plaintiff's opening brief was filed on July 25, 2014, and Defendant's responsive brief was

26   filed on October 8, 2014.  (Docs. 15, 22.)  On November 5, 2014, Plaintiff sought leave to file a

27   reply brief out of time and simultaneously filed a reply brief.  (Docs. 23, 24.)  The request to file a

28   reply brief out of time is GRANTED, and the reply brief is deemed timely filed.

1    As such, the matter is currently before the Court on the parties' briefs, which were

2  submitted, without oral argument, to the Honorable Sheila K. Oberto, United States Magistrate

3  Judge.[1]

4                                    **FACTUAL BACKGROUND**

5    Plaintiff filed applications for SSI on April 29, 2010, alleging disability beginning on July

6  20, 1994, due to degenerative disc disease, osteoporosis, and mental issues.  (AR 176.)

7  **A.    Relevant Mental Health Medical Evidence**

8    On October 7, 2006, Plaintiff underwent a consultative mental examination by James

9  Scaramozzino, PhD, in relation to a prior SSI application.   (AR 233-37.)   Plaintiff's chief

10  complaints included that she had no job, she suffered chronic pain, experienced financial worries

11  related to her medical problems, and she reported a depressed mood with no interest in pleasurable

12  activities, poor memory and concentration, sleep disturbance, suicidal thoughts, and she was upset

13  and easily fatigued.  (AR 233.)  Plaintiff explained she had moved back to California from Florida

14  about six months before the examination as she was unable to get Medi-Cal in Florida.  She had

15  been living with a partner in Florida, but the partner could no longer afford Plaintiff's medication,

16  and thus Plaintiff had to come back to California.  (AR 234.)  Plaintiff was living with her sister at

17  the time of the examination and was attempting to get medical care and a regular source of

18  income.  (AR 234.)

19    Plaintiff reported she smoked marijuana since she was 18, but now she smoked it primarily

20  for pain management.  (AR 234.)  Upon examination, Dr. Scaramozzino noted Plaintiff appeared

21  much older than her stated age, her attitude and behavior were cooperative, and she was hopeful

22  about being able to obtain access to medical care.  (AR 235.)  Dr. Scaramozzino described her

23  mental functioning as below average; her calculation ability was poor, and determined she had

24  difficulty performing simple mathematical calculations.  (AR 236.)  Her concentration was within

25  normal limits, her recent and remote memory was intact, and her fund of knowledge was

26  consistent with her education and socioeconomic background.  (AR 236.)  Dr. Scaramozzino

27  indicated Plaintiff answered questions in an open and honest manner, and there was no evidence

28
_____
[1]  The parties consented to the jurisdiction of a U.S. Magistrate Judge.  (Docs. 6, 7.)

she exaggerated her symptoms or any inconsistencies throughout the examination.  (AR 236.)

Plaintiff's symptoms were considered to be within the "mild range," and her limitations appeared

primarily due to medical problems.  (AR 237.)  Dr. Scaramozzino opined Plaintiff did not appear

to be suffering from a major mental disorder at that time.  (AR 237.)  Dr. Scaramozzino opined

Plaintiff could manage her own funds, she had a good ability to understand and remember short

instructions as well as detailed instructions and to maintain concentration and attention. (AR 237.)

She also had a good ability to accept instructions from supervisors, sustain an ordinary routine

without special supervision, complete a normal workday or workweek without interruption,

interact with coworkers, and deal with various changes in the work setting.  (AR 237.)  Dr.

Scaramozzino opined Plaintiff had a minimal chance of emotionally deteriorating in the work

environment.  (AR 237.)

In August 2007, Plaintiff was seen at Madera County Mental Health.  (AR 260-63.)

Plaintiff reported suicidal thoughts on a daily basis and that she felt hopeless and worthless.  (AR

260.)   She reported difficulty staying on-topic mentally, and her sleep pattern was broken

throughout the night.  She felt tired and irritable, and she claimed to be socially isolated staying

mostly to herself.  (AR 260.)  It was noted that Plaintiff was depressed, but her affect was deemed

appropriate, she was well-groomed, calm, and her thought process was intact.  (AR 260.)  It was

also noted that Plaintiff had moderate functional impairment in the areas of living arrangement,

social relationships, and daily activities.  (AR 261.)  Plaintiff reported she had not used marijuana

since the 60s.  (AR 262.)  She was diagnosed with major depressive disorder.  (AR 263.)

Plaintiff engaged in counseling sessions with Jerome M. Lanigan, PhD, LMFT, at Madera

County Mental Health.  At her first session in September 2007, Plaintiff discussed her social

security appeal and that she had a bad back from an old injury.  (AR 259.)  Plaintiff reported she

was going to be moving in with her niece and was feeling positive about that.  (AR 259.)  Plaintiff

attended group therapy sessions in September and October 2007.  (AR 254-58.)  At a follow-up

therapy session in October 2007, Plaintiff reported she had gotten a new doctor who had taken X-

rays of her back, she was sleeping better, and she was "getting out more" to deal with her feelings

of isolation.  (AR 253.)

On November 5, 2007, Plaintiff attended a counseling session with Russell Pippin, M.F.T., and reported depression and overall anxiety due to events that happened to her in early childhood. (AR 251.)

Plaintiff was a "no-show" for two group therapy sessions in November 2007 (AR 249, 250), but she reported for an individual therapy session on November 19, 2007.  The treatment plan was to continue focusing on reducing her depression and anxiety, and another therapy session was scheduled for the following week.  (AR 248.)

Plaintiff continued weekly counseling sessions until February 2008.  (AR 238-47.)  On February 7, 2008, she reported that her depression was "still there" but not as intense as when she first came in for treatment.  (AR 238.)  Another therapy session was scheduled the following week.  (AR 238.)  No further progress notes of therapy are contained in the record.

On May 21, 2011, Plaintiff underwent a consultative psychiatric examination with Ekram Michiel, M.D.  (AR 391-93.)  Plaintiff reported having been sad for a long time, but her sadness had worsened when her great-nephew committed suicide in 2004.  (AR 291.)  She stated she is depressed more days than not, and she does not sleep.   (AR 391.)  She feels isolated and cries easily; she also gets angry easily, and she is not motivated to do things.  She worries a lot and she feels trapped.  She reported being unable to breathe when people are around her.  (AR 391.)

Upon examination, Dr. Michiel noted Plaintiff appeared able to perform simple math calculations, her memory was impaired, but her immediate recall was fair.  She demonstrated fair judgment and insight, but a poor fund of knowledge.  (AR 393.)  Dr. Michiel opined Plaintiff was able to maintain attention and concentration to carry out simple job instructions, but not detailed or complex instructions, and she was able to relate and interact with coworkers, supervisors and the general public.  (AR 393.)

On June 13, 2012, Patricia Barbala, M.D., drafted a letter indicating that Plaintiff had been under her care since July 2010.  (AR 400.)  She indicated Plaintiff suffered from moderately severe memory loss, both short and long term.  (AR 400.)  Dr. Barbala opined that Plaintiff was unable to handle her personal affairs, as she was unable to remember basic facts or pertinent medical history.  She relied completely on family members and friends.  (AR 400.)

**B.      Physical Health Medical Evidence**

On July 14, 2010, a computed tomography ("CT") was taken of Plaintiff's lumbar spine which showed mild osteoarthritis/osteopenia, degenerative disc disease at L5-S1, but no acute osseous injury or changes were observed.  (AR 340.)  An impression of degenerative disc disease at L5-S1 was noted.  (AR 340.)  A magnetic resonance imaging scan ("MRI") was taken on October 22, 2010, which showed "mild bilateral neural foraminal and lateral recess stenosis" which is exacerbated by a broad-based disc bulge.  (AR 339.)  Mild central spinal stenosis was noted at the L4-L5 level, as well as compression of the thecal sac, but no definite nerve root compression.  (AR 339.)

On October 27, 2010, Plaintiff was examined by Youseff Hadweh, M.D.[2]  (AR 319.)  Dr. Hadweh indicated Plaintiff had reported a 10-year history of back pain that was progressive in nature.  She reported worsening pain while walking, and numbness in the soles of her feet with associated tingling which she had been experiencing for the prior three months.  (AR 319.)  She stated her legs give out on her when she walks, and she has radiating pain down her legs from her back.  (AR 319.)  Upon examination, Dr. Hadweh opined Plaintiff had primarily peripheral neuropathy and possible mononeuropathy multiplex of her upper and lower extremities.  (AR 320.)  Upon reporting chest pain and shortness of breath, Plaintiff was referred to cardiologist Thampi K. John, M.D., by Dr. Hadweh's office.  (AR 314.)  Dr. John noted he would conduct an exercise treadmill test and echocardiogram as well as a 24-hour halter monitor test to evaluate Plaintiff's symptoms.  (AR 315.)

On October 29, 2010, Plaintiff underwent cervical spine X-rays.  (AR 308.)  The radiologist reported there was "very severe multilevel degenerative changes including loss of normal cervical lordosis and bilateral neural foraminal stenosis." (AR 308, 330, 337.)

On November 10, 2010, Plaintiff underwent an electromyography ("EMG") and Nerve Conduction Study conducted by neurologist Mythili Sundaresan, M.D., which showed cervical radiculopathy, brachial plexopathy, and electrophysicological evidence of right carpal tunnel

_____

[2] It appears that Dr. Barbala is a physician at Dr. Hadweh's office, and that Dr. Barbala was Plaintiff's treating physician.

1  syndrome.  (AR 327.)  Dr. Sundaresan listed an impression of Right L5, S1 root lesion and
2  peripheral neuropathy. (AR 324.)

3      On November 11, 2010, Plaintiff underwent an echocardiogram with Dr. John that showed
4  normal left ventricular function.  (AR 316-18.)  Plaintiff also took a treadmill test for six minutes
5  and achieved 10 METS.[3] (AR 313.)

6      Treatment notes from July 2010 to February 2011 record examinations at Dr. Hadweh's
7  office, although the progress notes appear to be signed by Dr. Barbala.  (AR 334-50, 355-80.)  The
8  notes reflect reports of chronic low back pain and of a memory problem.  (AR 355-80.)  On
9  August 25, 2010, a progress report indicates Plaintiff was to be given a neurology referral related
10 to dementia.  (AR 364.)  On June 29, 2011, Plaintiff reported continued pain and was referred for
11 physical therapy.  Plaintiff was treated monthly from July 2011 to April 2012 for continued low
12 back pain and decreasing memory.  (AR 401, 405-06, 409, 413-15.)   October 2011 records from
13 Dr. Hadweh's office indicate Plaintiff was using marijuana as well as crank, and a drug screen was
14 ordered which was positive for marijuana.  (AR 408-09.)

15     On March 18, 2011, state agency non-examining physician C. De la Rosa, M.D., reviewed
16 Plaintiff's medical record.  (AR 381-89.)  Dr. De la Rosa opined Plaintiff could lift and carry up to
17 50 pounds occasionally and 25 pounds frequently; stand, sit or walk for a total of about six hours
18 in an eight-hour workday; frequently climb, stoop, kneel, crouch, or crawl, but only occasionally
19 balance.  (AR 382-83.)  Dr. De la Rosa indicated the neurology examination by Dr. Sundaresan
20 noted only peripheral neuropathy findings.  Dr. De la Rosa noted that Dr. Sundaresan had found
21 motor strength decrease in Plaintiff's left grip and shoulder, but Plaintiff's reflexes were
22 symmetrical, gait and spine examinations were normal.  (AR 389.)  While there was a right L5-S1
23 root lesion, Plaintiff did not have any localized focal findings in any of these areas with weakness
24 or loss of range of motion or atrophy.  (AR 389.)  The cardiac test results noted Plaintiff exercised
25 reaching 10 METS, which would support a medium work level.  (AR 389.)  Although there is a

26

27 _____

[3] A MET is defined as the resting metabolic rate – i.e., the amount of oxygen consumed at rest.  Work at 2 METS
requires twice the resting metabolism and three METS requires three times the resting metabolism.  M. Jette K.
28 Sidney, G. Blumchen, *Metabolic Equivalents (METS) in Exercise Testing, Exercise Prescription, and Evaluation of
Functional Capacity.*  Clinical Cardiology 13, 555-565 (1990).

level of degenerative disc disease, there is no loss of function noted and her pain is controlled by ibuprofen.  (AR 389.)

## C.     Lay Testimony of Helen D. Routt

Helen Routt, Plaintiff's sister, completed a function report on Plaintiff's behalf.  (AR 195-202.)  Ms. Routt stated she sees Plaintiff every day and takes her for appointments.  (AR 195.)  On an average day, Plaintiff wakes, showers, is assisted with washing her hair and uses a shower chair.  She watches television until lunch, and then she attempts to do crafts if nothing hurts too much.  She walks to get the mail and then showers again after walking.  She rests before dinner, and then watches more television after dinner.  By the time she is ready for bed, she has had a long day and is usually "hurting pretty bad[ly]."  (AR 195.)  She is able to care for a pet dog, takes her outside, feeds, and walks the dog.  (AR 196.)  Prior to her injuries, she loved to work outside gardening, mowing the lawn, and riding her bike.  Now, her body hurts all the time and her back will "cramp" when she least expects it.  She loses feeling in her legs, hands, and feet, and she experiences headaches and stomachaches.  (AR 196.)

Regarding her personal care, Plaintiff usually takes a shower, but it is hard for her to bend or stand for a long period of time.  She sits down to shave, and she is "getting worse day by day." (AR 196.)  She "does less of everything," despite trying very hard.  (AR 196.)  She needs reminders to take her medicine and she forgets things very easily.  (AR 197.)  She prepares the simplest things possible for food such as sandwiches, frozen foods, pizza, fish, or vegetables.  (AR 197.)  If she is unable to cook, her niece will do it for her.  (AR 197.)  She is able to perform household chores like dusting, dishes, and laundry and she does each of these about 2 times per week for about an hour and a half each time.  (AR 197.)  Plaintiff is unable to do any bending or standing that yard work requires.  (AR 198.)  She loses her balance and her whole body freezes at times.  (AR 198.)  She goes outside about three times per day to let the dogs out – so long as it is not too hot.  (AR 198.)

Plaintiff gets depressed and feels down when she is unable to do what she wants; Ms. Routt attempts to cheer her by telling her she will get disability soon and thus obtain some treatment for her problems.  (AR 197.)   Plaintiff is able to pay bills and count change, but she

1  cannot handle a savings or checking account as she forgets too much.  Additionally, she has not

2  had enough money to have a checking or savings account.  (AR 198.)

3      Her hobbies have dwindled since her health problems.  (AR 199.)  Plaintiff used to do

4  crafts, put up pictures on pieces of wood, and read, but now she does less and less of each of these.

5  (AR 199.)  Ms. Routt describes Plaintiff as not very social and having a short attention span.

6  (AR 199.)  Because of her worsening condition, she likes to have someone with her to feel safe.

7  (AR 199.)  Plaintiff also has a short temper and is quick to anger; she is more forgetful and less

8  talkative.  (AR 200.)

9      Plaintiff can walk approximately half a block before needing to rest for approximately 10

10  minutes; she can only pay attention for five minutes or less, and she forgets what she is doing a

11  lot.  (AR 200.)  She cannot follow written instructions well, and she does not follow spoken

12  instructions.  (AR 200.)  She is unable to handle stress, and she tends to shut down, sleep, cry, or

13  get upset when presented with stressors.  (AR 201.)  She does not like life changes as she is upset

14  and confused by changes.  (AR 201.)  She is fearful of things she cannot understand such as

15  people and her health.  (AR 201.)

16  **B.      Administrative Proceedings**

17      The Commissioner denied Plaintiff's application initially and again on reconsideration;

18  consequently, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ").  (AR 65-

19  86, 101-03.)  A hearing was held on June 22, 2013, before ALJ John Cusker.  (AR 26-50.)

20          **1.      Plaintiff's Hearing Testimony**

21      Plaintiff testified that she was born on December 7, 2947, she is single, she has a driver's

22  license and she is able to drive.  (AR 30.)  She lives on her nephew's property in his three bedroom

23  motor home.  (AR 32, 34.)  She is a high school graduate, and she has not done any work in the

24  last 15 years.  (AR 31.)  Her sister drove her to the hearing before the ALJ.  (AR 31.)

25      Plaintiff explained that she is unable to work because she has pain that starts in her neck

26  and radiates down to her legs; her hands, legs, and feet become numb.  (AR 31.)  She had physical

27  therapy in the past, but it was not helpful and she remains in pain.  (AR 32.)  She takes medication

28  for her pain, which relieves her symptoms and she suffers no side effects.  (AR 32.)  She forgets to

take her medication sometimes at night, and her sister will call her and remind her to take them. (AR 40.)  Her sister "fixes" her pills for her for two weeks at a time.  (AR 41.)  No physician has ever recommended surgery.

Plaintiff is able to dress and bathe herself and she is able to prepare her own meals. (AR 33.)  She does her own laundry, but her niece does her shopping.  (AR 34.)  She has hobbies including silk screening t-shirts and making jewelry; she cannot string the jewelry anymore, however, because of her hands.  (AR 34.)  Now, she works in the yard watering plants for her niece.  (AR 34.)  Once in a while, she will sweep floors.  (AR 34.)  She spends her time "[h]anging around the house, going outside, checking the animals."  (AR 35.)  She watches a lot of television, and she seldom visits anyone – she stays home a lot.  (AR 35.)  She has friends who visit her, however, and her sister visits her as well.  (AR 35-36.)

Regarding her mental health treatment, she was in treatment in Madera when she first came back from Florida sometime in 2007.  (AR 36.)  She now sees Dr. Barbala every few weeks, and Dr. Barbala prescribes medication.  (AR 37.)  She has memory problems, and she was referred to a neurologist for dementia testing.  (AR 39.)

Physically, Plaintiff can tolerate being on her feet about 30 minutes at a time and only one hour total each day.  (AR 37.)  She can sit continuously for approximately one hour, and the heaviest thing she can lift is a gallon milk jug.  (AR 38.)  Her hands go numb, and she drops things.  (AR 38.)  Her legs and her feet also go numb; she has had this problem for years and it continues to worsen.  (AR 42.)

Her sister keeps all her mail for her because Plaintiff cannot remember what she does with things – she loses paperwork all the time.  (AR 42.)  For the past several years, Plaintiff has received a social security check related to retirement benefits.  (AR 43-44.)  Her niece helps her with that incoming money; Plaintiff does not keep the money herself.  (AR 44.)

**2.      Testimony of Vocational Expert**

A Vocational Expert ("VE") testified at the hearing.  The ALJ asked the VE to consider a person of Plaintiff's age, education, and work history with the ability to lift and carry 50 pounds occasionally, and 25 pounds frequently; stand and walk with normal breaks for about six hours in

an eight-hour workday; push and pull without limitation; perform all postural activities frequently except only occasional ladder, rope, or scaffold climbing; no manipulative, visual, communicative, or environmental limitations; can maintain attention and concentration to carry out only simple job instructions; is able to relate and interact with co-workers, supervisors, and the general public, but is unable to carry out an extensive variety of technical or complex instructions.  (AR 46.)  The VE testified that such a person would be able to perform work in the national economy as an automobile detailer, hospital cleaner, and as a "cook helper."  (AR 47.)

Plaintiff's counsel asked the VE to consider the same individual as in the first hypothetical, but with the following limitations:  the ability to lift only eight pounds occasionally; would need a sit-stand option; only occasional use of hands for gross and fine manipulation; and could sit or stand for six hours of an eight-hour workday.  (AR 48.)  The VE testified that such an individual would not be able to perform any of the work identified in response to the first hypothetical.  (AR 48.)

The ALJ noted for the record that if the claimant were limited to even the full range of light work, the medical vocational rules would direct a finding of disabled.  The ALJ additionally noted that what was missing was "any medical source opinion that indicates that degree of limitation."  (AR 49.)

### 3. The ALJ's Decision

On September 14, 2012, the ALJ issued a decision, finding Plaintiff not disabled since April 29, 2010.  (AR 12-21.)  Specifically, the ALJ found that Plaintiff (1) had not engaged in substantial gainful activity since April 29, 2010 (AR 14); (2) Plaintiff had severe impairments, including degenerative disc disease of the cervical and lumbar spine; osteoporosis; adjustment disorder with depressed mood; and history of polysubstance abuse in reported recent remission (AR 15); (3) did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1  (AR 15); and (4) had the residual functional capacity  ("RFC")  to perform medium work with the following modifications:  stand about six hours of an eight hour workday; sit about six hours of an eight hour workday;  occasionally  climb  ladders,  ropes,  and  scaffolds;  frequently  balance,  stoop,  kneel,

crouch, crawl, and kneel; and is able to maintain attention and concentration to carry out simple job instructions, relate to and interact with coworkers, supervisors, and the public, but is unable to carry out an extensive variety of technical or complex instructions (AR 16).  The ALJ found that Plaintiff has no past relevant work (AR 19), but she retained the ability to perform other work such as an automobile detailer, hospital cleaner, and cook helper (AR 20).  The ALJ concluded Plaintiff was not disabled as defined by the Social Security Act at any time from April 29, 2010, through the date of decision.  (AR 21.)

Plaintiff sought review by the Appeals Council on September 28, 2012.  (AR 8.)  The Appeals Council denied Plaintiff's request for review on October 9, 2013.  (AR 1-7.)  Therefore, the ALJ's decision became the final decision of the Commissioner.  20 C.F.R. § 416.1481.

**C.**     **Plaintiff's Argument on Appeal**

On December 6, 2013, Plaintiff filed a complaint before this Court seeking review of the ALJ's decision.  Plaintiff argues the ALJ erred in failing to properly evaluate the opinion of Dr. Barbala and the lay testimony of Plaintiff's sister, Ms. Routt.

## SCOPE OF REVIEW

The ALJ's decision denying benefits "will be disturbed only if that decision is not supported by substantial evidence or it is based upon legal error." *Tidwell v. Apfel*, 161 F.3d 599, 601 (9th Cir. 1999).  In reviewing the Commissioner's decision, the Court may not substitute its judgment for that of the Commissioner.  *Macri v. Chater*, 93 F.3d 540, 543 (9th Cir. 1996).  Instead, the Court must determine whether the Commissioner applied the proper legal standards and whether substantial evidence exists in the record to support the Commissioner's findings.  *See Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007).  "Substantial evidence is more than a mere scintilla but less than a preponderance." *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008).  "Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)).  The Court "must consider the entire record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion, and may not affirm simply by isolating a

1   specific quantum of supporting evidence." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir.

2   2007) (citation and internal quotation marks omitted).

3                                                    **APPLICABLE LAW**

4          An individual is considered disabled for purposes of disability benefits if he or she is

5   unable to engage in any substantial, gainful activity by reason of any medically determinable

6   physical or mental impairment that can be expected to result in death or that has lasted, or can be

7   expected to last, for a continuous period of not less than twelve months.   42 U.S.C.

8   §§ 423(d)(1)(A), 1382c(a)(3)(A); *see also Barnhart v. Thomas*, 540 U.S. 20, 23 (2003).   The

9   impairment or impairments must result from anatomical, physiological, or psychological

10  abnormalities that are demonstrable by medically accepted clinical and laboratory diagnostic

11  techniques and must be of such severity that the claimant is not only unable to do her previous

12  work, but cannot, considering her age, education, and work experience, engage in any other kind

13  of substantial, gainful work that exists in the national economy.   42 U.S.C. §§ 423(d)(2)-(3),

14  1382c(a)(3)(B), (D).

15         The regulations provide that the ALJ must undertake a specific five-step sequential

16  analysis in the process of evaluating a disability.   In the First Step, the ALJ must determine

17  whether the claimant is currently engaged in substantial gainful activity.   20 C.F.R. §§

18  404.1520(b), 416.920(b).  If not, in the Second Step, the ALJ must determine whether the claimant

19  has a severe impairment or a combination of impairments significantly limiting her from

20  performing basic work activities. *Id*. §§ 404.1520(c), 416.920(c).  If so, in the Third Step, the ALJ

21  must determine whether the claimant has a severe impairment or combination of impairments that

22  meets or equals the requirements of the Listing of Impairments ("Listing"),   20 C.F.R. 404,

23  Subpart P, App. 1.   *Id*. §§ 404.1520(d), 416.920(d).   If not, in the Fourth Step, the ALJ must

24  determine whether the claimant has sufficient residual functional capacity despite the impairment

25  or various limitations to perform her past work. *Id*. §§ 404.1520(f), 416.920(f).  If not, in the Fifth

26  Step, the burden shifts to the Commissioner to show that the claimant can perform other work that

27  exists in significant numbers in the national economy.   *Id*. §§ 404.1520(g), 416.920(g).   If a

28  claimant is found to be disabled or not disabled at any step in the sequence, there is no need to

1 consider subsequent steps. *Tackett v. Apfel*, 180 F.3d 1094, 1098-99 (9th Cir. 1999); 20 C.F.R. §§

2 404.1520, 416.920.

3 **DISCUSSION**

4 **A.    The ALJ's Consideration of Dr. Barbala's Opinion**

5      Plaintiff argues the ALJ improperly discredited Dr. Barbala's opinion that Plaintiff is

6 unable to handle her personal affairs, "as evidenced by an inability to remember basic facts or

7 pertinent medical history.  Carolyn relies completely on family members and friends."  (AR 400.)

8 Dr. Barbala also opined Plaintiff was unable to handle her activities of daily living such as

9 shopping, handling money, and taking care of herself.  (AR 400.)  Dr. Barbala noted Plaintiff

10 required assistance during all her appointments, as well as assistance with transportation, due to

11 her "mental status."  (AR 400.)

12      **1.    Inconsistency with Other Medical Opinions**

13      Among three of the reasons the ALJ articulated for giving less weight to Dr. Barbala's

14 opinion was its inconsistency with other medical opinions, particularly that of Dr. Michiel.

15 (AR 18.)

16      Plaintiff contends this was error because Dr. Michiel and Dr. Barbala relied on the same

17 clinical findings:   both observed Plaintiff suffered from memory loss.   As Dr. Barbala was

18 Plaintiff's treating physician, her opinion was entitled to deference and Dr. Michiel's opinion could

19 not constitute substantial evidence because it was based on the same findings.  Plaintiff cites *Orn*

20 *v. Astrue*, 495 F.3d 625 (9th Cir. 2007) for the proposition that when an examining physician

21 relies on the same clinical findings as a treating physician, but differs only in his conclusions, the

22 conclusions of the examining physician are not substantial evidence.   Thus, the ALJ erred in

23 assigning weight to Dr. Michiel's opinion while rejecting Dr. Barbala's opinion.

24      Defendant argues Dr. Michiel and Dr. Barbala did not rely on the same findings:  Dr.

25 Barbala relied only on Plaintiff's self-reporting rather than on any objective clinical findings.

26 During the two-year treating relationship with Plaintiff, Dr. Barbala did not offer any diagnosis of

27 Plaintiff's psychiatric condition, a prognosis for Plaintiff's condition, or any assessment of

28 Plaintiff's ability to work.  Not a single visit with Dr. Barbala was for the purpose of evaluating

1   Plaintiff's psychiatric conditions.   Nothing in Dr. Barbala's treatment records demonstrates

2   findings to support her opinion that Plaintiff has memory loss and is unable to handle her personal

3   affairs.   Additionally, while Dr. Barbala noted that Plaintiff required assistance during all her

4   medical examinations, none of Dr. Barbala's treatment notes make such an observation.

5        Defendant also argues that, even assuming Dr. Barbala had relied on some objective

6   findings in forming her opinion, Dr. Michiel based his own opinion on an independent

7   examination where he made his own clinical findings.   An examining physician's opinion based on

8   his own clinical findings, even when it contradicts a treating physician's opinion, may constitute

9   substantial evidence.   Not only did Dr. Michiel conduct a psychiatric examination, he is a board

10  certified psychiatrist – a specialist – which Dr. Barbala is not.   Unlike Dr. Barbala, Dr. Michiel

11  relied on examination findings directly related to Plaintiff's mental condition and diagnosed

12  Plaintiff with an adjustment disorder.   Dr. Barbala provided no mental diagnosis during her entire

13  two-year treating history of Plaintiff.

14       The ALJ was entitled to disregard Dr. Barbala's opinion as inconsistent with that of Dr.

15  Michiel.   Although the opinion of a treating physician is generally entitled to more weight, a non-

16  treating physician's opinion may support rejecting the conflicting opinion of a claimant's treating

17  physician.   *Andrews v. Shalala*, 53 F.3d 1035, 1041 (9th Cir. 1995).   So long as a non-treating

18  physician's opinion is based on independent clinical findings that differ from the findings of the

19  treating physician, the non-treating physician's opinion may constitute substantial evidence.   *Id.* at

20  1041.

21       Plaintiff argues that because Dr. Michiel found Plaintiff limited in her short-term and long-

22  term memory, as noted by Dr. Barbala, the two physicians relied on the same clinical findings but

23  simply reached divergent conclusions.   As Dr. Barbala is Plaintiff's treating physician, her opinion

24  that is entitled to deference over that of Dr. Michiel.   The fact that both Dr. Michiel and Dr.

25  Barbala noted memory loss, however, does not mean the two physicians predicated their opinions

26  on the same set of clinical findings.   For example, this is not a situation where the two physicians

27  compared the same set of objective findings, such as from an MRI, and simply reached differing

28  conclusions about the limitations the findings supported.   As held by the court in *Orn v. Astrue*,

495 F.3d 625, 632 (9th Cir. 2007) "when an examining physician provides 'independent clinical findings that differ from the findings of the treating physician,' such findings are 'substantial evidence.'" (quoting *Miller v. Heckler*, 770 F.2d 845, 849 (9th Cir.1985)).   The court further explained that "[i]ndependent clinical findings can be either (1) diagnoses that differ from those offered by another physician and that are supported by substantial evidence, [citation omitted] or (2) findings based on objective medical tests that the treating physician has not herself considered [citation omitted]."  *Id.*

The only overlap in the opinions of Drs. Barbala and Michiel was the notation for memory loss, but this was not the *only* finding Dr. Michiel considered in reaching his opinion.   Dr. Michiel's opinion was predicated on his own psychiatric examination of Plaintiff.   He considered Plaintiff's cognitive skills and noted she was oriented to person, place and date; she had fair attention and concentration; she appeared able to perform simple math calculations; her immediate recall and judgment were fair; abstract thinking was concrete, but her fund of knowledge was poor and her short and long-term memory was impaired.   (AR 393.)   Dr. Michiel diagnosed Plaintiff with an adjustment disorder with depressed mood and assigned Plaintiff a GAF score of 55.   (AR 393.)   He opined Plaintiff retained the ability to maintain attention and concentration necessary to carry out simple job instructions.   (AR 293.)   In other words, Dr. Michiel made a variety of findings beyond his observation that Plaintiff's short and long term memory was impaired.   The two opinions were not based on the same set of clinical findings simply because each physician made a similar observation about Plaintiff's memory.

Moreover, while Dr. Barbala noted Plaintiff had short term and long-term memory loss ostensibly based upon her treating history with Plaintiff, there are no clinical findings or notations within her treating records to show this memory loss rendered Plaintiff unable to handle her activities of daily living and take care of herself.   It is not clear that Dr. Barbala ever treated Plaintiff for her memory problems.   As the Commissioner notes, no diagnosis was rendered and no treatment was proposed for this problem.   Although Dr. Barbala made a notation of "dementia" in one of her treating notes (AR 364-65), there was no follow-up indicated in the record, and Plaintiff conceded at the hearing that she was not being treated for memory loss (AR 37).   While Plaintiff

1 argues in her reply brief that she had no access to a specialist for dementia and could not follow up

2 because of her limited financial means, there is no evidence Plaintiff was unable to obtain

3 treatment for her memory problem, particularly as Plaintiff was receiving other medical treatment.

4 Plaintiff testified that she had Medicare and it is unclear why she would not have had access to

5 care for possible dementia.  (AR 44.)

6      Finally, the ALJ noted that Plaintiff *was* referred to a neurologist in 2010, but the specialist

7 did not investigate Plaintiff's memory issues but focused only on her physical problems.  (AR 44-

8 45.)  Dr. Barbala's notation that Plaintiff suffered memory loss appears based only on Plaintiff's

9 subjective reports, and was not pursued as a serious medical issue that would support Dr. Barbala's

10 opinion that memory loss precluded Plaintiff from functioning in her daily activities.   The ALJ

11 was entitled to give Dr. Barbala's opinion less weight because it was inconsistent with Dr.

12 Michiel's examination findings and opinion.

13      In sum, the ALJ did not err in assigning weight to Dr. Michiel's opinion over that of Dr.

14 Barbala.

15      **2.    The ALJ Properly Considered Plaintiff's Daily Activities**

16      In assigning less weight to Dr. Barbala's opinion, the ALJ found the opinion inconsistent

17 with Plaintiff's admitted daily activities including shopping, cooking, doing household chores and

18 riding a bicycle.  (AR 18.)  Plaintiff contends her activities such as riding a bike, doing crafts on a

19 good day, or trying to walk at her doctor's recommendation do not constitute activities that exceed

20 the limitations identified by Plaintiff or Dr. Barbala.

21      The Commissioner argues that Plaintiff admitted she could cook, do laundry, perform

22 some housework, "fiddle" around in the yard, feed dogs, drive a car, and ride a bicycle during the

23 relevant time period.  Dr. Barbala, on the other hand, opined Plaintiff was incapable of handling

24 her own personal affairs, activities of daily living, or show up for a doctor's visit without any

25 assistance.  In light of Plaintiff's activities, Dr. Barbala's opinion is overly restrictive as Plaintiff is

26 not entirely debilitated by her mental condition as Dr. Barbala opines.

27      A conflict between a treating physician's opinion and a claimant's daily activities may

28 justify rejecting a treating provider's opinion.  *Ghanim v. Colvin*, 763 F.3d 1154, 1162 (9th Cir.

2014) (citing *Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 600-02 (9th Cir. 1999)).   In *Ghanim*, the claimant's (Ghanim) treating and examining providers opined that he had a number of severe limitations in his ability to relate to coworkers and supervisors, interact appropriately in public, respond appropriately to and tolerate the pressures of a normal work setting, and to maintain appropriate behavior.   Ghanim's treating physicians sent a letter to Ghanim's attorney noting that due to Ghanim's mental illness, they felt it was "highly unlikely" that he would be able to engage in meaningful adult activities or employment in the near future and cited Ghanim's symptoms which included low energy and depressed mood as well as his diagnoses of PTSD and major depression.   *Id*. at 1157.   Ghanim testified that he was able to perform some basic chores and occasionally socialized, which the ALJ found inconsistent with the opinions of Ghanim's treating physicians.   The court held that a holistic review of the record did not show any actual inconsistency as determined by the ALJ.   While Ghanim could engage in some basic chores and did a little socializing, the record also revealed he relied heavily on his caretaker, struggled with social interactions, and limited himself to low-stress environments.   *Id*. at 1162.

Here, there is evidence from which the ALJ could reasonably determine Plaintiff's admitted daily activities were inconsistent with Dr. Barbala's opinion of Plaintiff's limitations.   Dr. Barbala opined Plaintiff was debilitated by her mental condition to the point that Plaintiff was unable to perform activities of daily living or show up for her doctor's appointments without assistance.   Severe memory loss that incapacitates one to the point that she is unable answer pertinent medical questions at examinations or "remember basic facts" (AR 400) – which the Commissioner correctly contends was never documented by Dr. Barbala in her treating notes – appears inconsistent with Plaintiff's ability to ride a bicycle "to get around" (AR 392) as this demonstrates an ability to independently remember where to go and how to return home again. Plaintiff testified she is able to dress and bathe herself, prepare her own meals, do laundry, perform some housework, and feed and give water to pets (AR 33-35).   The fact that Plaintiff is entrusted with the care of pets (AR 35) and retains the ability to drive a car (AR 30), and is therefore entrusted with the health and safety of others on the road, belies Dr. Barbala's opinion that Plaintiff is debilitated in her ability to "handl[e] her activities of daily living."   (AR 400.)

1    Dr. Barbala's extremely restrictive opinion of Plaintiff's ability to function is also
2  distinguishable from the opinions of the physicians' in *Ghanim* in that those opinions were
3  supported by specific findings and diagnoses.  In contrast to *Ghanim*, Dr. Barbala's opinion is
4  merely a conclusion with no supporting findings or diagnoses.  Plaintiff's admitted daily activities
5  appear more independent and require more ability than opined to by Dr. Barbala, , and thus the
6  ALJ was entitled to interpret the activities as inconsistent with the restrictions in Dr. Barbala's
7  opinion.  The ALJ did not improperly consider the scope of Plaintiff's daily activities in refusing to
8  credit the restrictive opinion of Dr. Barbala.

9         **3.      Failure to Note Substance Abuse**

10    The ALJ determined Dr. Barbala's opinion was further undermined by her failure to
11  mention Plaintiff's recent history of polysubstance abuse.  (AR 18.)  Plaintiff argues Dr. Barbala's
12  treating records demonstrate she was fully aware of Plaintiff's drug use as Dr. Barbala had ordered
13  a drug screen which showed only marijuana use.

14    Dr. Barbala's failure to note this substance abuse undercuts her opinion in that significant
15  findings were overlooked and not discussed or even acknowledged in Dr. Barbala's opinion.  The
16  ALJ is entitled to discredit a treating physician's opinion that is conclusory, brief, and unsupported
17  by the record as a whole.  *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1195 (9th Cir.
18  2004).  Not only does Dr. Barbala fail to discuss the findings that support her opinion about
19  Plaintiff's lack of functional abilities, she failed to discuss objective findings regarding Plaintiff's
20  drug use.  Dr. Barbala's treating records are bereft of any objective evidence of Plaintiff's memory
21  problems, the treatment note recommending a referral to neurology was not pursued, and no
22  treatment for memory problems was prescribed or investigated.  For a condition that was entirely
23  disabling in Dr. Barbala's view, there is almost nothing in the treating notes to corroborate the
24  condition was considered seriously or treated.  In concert with the lack of medical consideration
25  for a problem that created such an opined lack of functional ability, the failure to note Plaintiff's
26  reported substance abuse and how that might affect her functional abilities or her memory is a
27  significant oversight and could reasonably be viewed as detracting from the credibility of Dr.
28  Barbala's conclusions.

1    In sum, the ALJ properly considered several elements in ascribing less weight to Dr.

2  Barbala's cursory opinion that Plaintiff is unable to handle activities of daily living or to take care

3  of herself.  (AR 400.)  Dr. Barbala's failure to note Plaintiff's substance abuse was a significant

4  finding in light of the opined limitations, and the ALJ was entitled to consider this oversight in

5  weighing Dr. Barbala's opinion.

6  **B.      The ALJ's Consideration of Third Party Lay Testimony**

7    The ALJ expressly considered the testimony of Plaintiff's sister, Ms. Routt, but declined to

8  give it weight.  (AR 19.)

9    Plaintiff argues the ALJ erred in rejecting third-party lay witness testimony from Ms. Routt

10  as an over-endorsement of Plaintiff's own testimony, that it was inconsistent with Plaintiff's own

11  demonstrated abilities at the hearing, and was inconsistent with Plaintiff's daily activities.  Plaintiff

12  argues Ms. Routt's observations are consistent with the observations made by Dr. Barbala.

13    The Commissioner contends the ALJ properly noted that Ms. Routt's testimony mirrored

14  Plaintiff's testimony, which was discredited.  The ALJ also permissibly considered Ms. Routt's

15  statement that Plaintiff could only pay attention for five minutes to be at odds with Plaintiff's

16  ability to concentrate at the hearing.

17    Lay testimony as to a claimant's symptoms or how an impairment affects the claimant's

18  ability to work is competent evidence that the ALJ must take into account.  *Nguyen v. Chater*,

19  100 F.3d 1462, 1467 (9th Cir. 1996).  The Ninth Circuit has held that competent lay witness

20  testimony cannot be disregarded without comment, *id.*, and that to discount it, the ALJ "must give

21  reasons that are germane to each witness."  *Dodrill v. Shalala*, 12 F.3d 915, 919 (9th Cir. 1993).

22  However, "[w]here lay witness testimony does not describe any limitations not already described

23  by the claimant, and the ALJ's well-supported reasons for rejecting the claimant's testimony apply

24  equally well to the lay witness testimony, it would be inconsistent with our prior harmless error

25  precedent to deem the ALJ's failure to discuss the lay witness testimony to be prejudicial per se."

26  *Molina v. Astrue*, 674 F.3d 1104, 1117 (9th Cir. 2012).

27    The ALJ gave germane reasons for discounting Ms. Routt's third-party function report

28  about Plaintiff's abilities.  Ms. Routt stated Plaintiff's ability to lift, squat, bend, stand, reach, walk,

1   sit, kneel, hear, and see were all affected, but the ALJ found that limitations in these areas are not

2   supported by the medical evidence. (AR 18.)  The ALJ also noted Plaintiff had demonstrated a

3   normal gait with no weakness and no reduced range of motion in her extremities, and there was no

4   evidence Plaintiff was impaired in her ability to hear or see.  Thus, Ms. Routt's statement was

5   inconsistent with the medical evidence.  This was a germane reason to reject Ms. Routt's

6   statement.

7       The ALJ contrasted Ms. Routt's statements that Plaintiff needed assistance with personal

8   care and that Plaintiff was not very active during the day with Plaintiff's admitted daily activities

9   which included a variety of household chores (AR 33-35), the ability to ride a bicycle (AR 392),

10  and perform her own personal grooming (AR 33).  The ALJ found Ms. Routt's statements

11  inconsistent with these daily activities.  (AR 18.)  Although Ms. Routt noted Plaintiff could only

12  pay attention for 5 minutes, the ALJ observed this conflicted with Plaintiff's demonstrated ability

13  at the hearing where Plaintiff paid attention and responded appropriately throughout the duration

14  of the 35-minute hearing.  (AR 18-19.)

15      Where observations at a hearing are relevant to a Plaintiff's stated limitations, such

16  observations may be used in assessing the claimant's credibility.  *Orn v. Astrue*, 495 F.3d 625,

17  639-40 (9th Cir. 2007).  Ms. Routt testified Plaintiff could not pay attention for more than 5

18  minutes, and Plaintiff's abilities at the hearing were directly contrary to that statement.  Although

19  Plaintiff argues the ALJ's reasoning invokes impermissible "sit and squirm" jurisprudence that has

20  been disapproved by reviewing courts, the argument is not persuasive.  The condemned "sit and

21  squirm" jurisprudence to which Plaintiff refers reflects an approach where the ALJ subjectively

22  arrives at an index of traits which he expects a claimant to manifest at the hearing given the

23  particular claimed conditions.  If the claimant fails to demonstrate symptoms on this "index," the

24  claim is denied.  *See Freeman v. Schweiker*, 681 F.2d 717, 731 (1982).  Here, the ALJ's

25  observation of Plaintiff's ability to concentrate and answer questions at the hearing is not

26  analogous to the type of "index" of symptoms considered in *Freeman*.  Plaintiff's ability to

27  concentrate or pay attention for five minutes is easily demonstrated and observable during the

28  course of a hearing where a claimant must pay attention to answer questions.  This is not

1  analogous to trying to observe symptoms of a condition such as pain, which can vary from person

2  to person, and do not necessarily correlate to the pain actually experienced.  The ALJ's observation

3  about Plaintiff's demonstrated ability to participate at the hearing does not fall into the "sit and

4  squirm" decision-making model which the Ninth Circuit has held improper.

5       The ALJ also found that Ms. Routt "over endorse[d]" Plaintiff's testimony about Plaintiff's

6  limitations, which was not fully credited by the ALJ.  Lay testimony that mirrors the claimant's

7  testimony may be rejected on the same grounds.  *Molina v. Astrue*, 674 F.3d 1105, 1114 (9th Cir.

8  2012) (citing *Valentine*, 574 F.3d at 694 (holding that because the "ALJ provided clear and

9  convincing reasons for rejecting [the claimant's] own subjective complaints, and because [the lay

10  witness's] testimony was similar to such complaints, it follows that the ALJ also gave germane

11  reasons for rejecting [the lay witness's] testimony").  Here, the ALJ found Ms. Routt's testimony to

12  be an over-endorsement of Plaintiff's statement of her limitations – which the ALJ rejected and

13  Plaintiff does not challenge.[4]  As with the other reasons offered, this is a germane reason to reject

14  lay testimony of a third party.

15  **C.**      **The ALJ Did Not Fail to Develop the Record or Improperly Consider Listing 1.04A**

16       Plaintiff argues that her objective medical findings are consistent with Listing 1.04A, and

17  the ALJ should have either found that she met the Listing or should have developed the record

18  more fully to determine whether the Listing was met or equaled.

19       At Step Three, the ALJ must assess whether the claimant has an impairment or

20  combination of impairments that meets or equals an impairment listed in the Appendix to the

21  federal regulations.  20 C.F.R. Part 404, Subpart P, App. 1.  Conditions set forth in the Listing of

22  Impairments ("Listings") are considered to be so severe that "they are irrebuttably presumed

23  disabling, without any specific finding as to the claimant's ability to perform his past relevant

24  work or any other jobs."  *Lester*, 81 F.3d at 828.  The Listings were "designed to operate as a

25

---

26  [4] In another section of Plaintiff's brief relating to whether the objective medical evidence meets a listed impairment
27  (Doc. 15, 16:14-17), Plaintiff asserts the ALJ's analysis of Plaintiff's physical testimony is "without merit" because the
    objective findings "approach if not meet listing level severity."  The court does not consider this a sufficiently briefed
    or argued contention regarding the ALJ's assessment of Plaintiff's credibility.  *See Grewal v. Choudhury*, 377 Fed.
28  App'x 617, 2010 WL 1583740 (9th Cir. 2010) (unpublished) (undeveloped issue not supported by argument is deemed
    abandoned).

presumption of disability that makes further inquiry unnecessary." *Sullivan v. Zebley*, 493 U.S. 521, 532 (1990). If a claimant shows that his impairments meet or equal a Listing, he will be found presumptively disabled. 20 C.F.R. §§ 416.925-461.926. The claimant bears the burden of establishing a prima facie case of disability under the Listings. *See Thomas v. Barnhart*, 278 F.3d 947, 955 (9th Cir. 2002). To "meet" a listed impairment, the claimant must establish that his condition satisfies each element of the listed impairment. *See Zebley*, 493 U.S. at 530. To "equal" a listed impairment, the claimant "must establish symptoms, signs, and laboratory findings" at least equal in severity and duration to each element of the listed impairment. *Id.*

Listing 1.04A relates to disorders of the spine such as "herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture, resulting in compromise of a nerve root (including cauda equine) or the spinal cord." To meet Listing 1.04A, the claimant must establish that she suffered from one of these conditions for a 12-month period and *also* the following requirements:

> Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine)[.]

20 C.F.R. § 404, Subpt P, Appx 1, Listing 1.04A.

Thus, 4 elements are required to meet the Listing, plus an additional element if the lower back is involved: (1) a disorder of the spine as specified; (2) evidence of nerve root compression; (3) limitation of motion of the spine; (4) motor loss (atrophy with associated muscle weakness) accompanied by sensory or reflex loss; and, in cases of lower back involvement, (5) a positive straight-leg raising test.

Plaintiff contends she meets or at equals all of these elements, and the ALJ failed to adequately consider the Listing or develop the record in light of any ambiguity in the evidence as to whether the Listing was met. Plaintiff argues that the record reflects neuroanatomic distribution of pain and sensory loss in the S1, C5-C7 distribution, as found by Dr. Sundaresan upon performing a neurological examination in October 2010. (AR 320.) Plaintiff also claims that loss

22

1  of range of motion was noted by the radiologist on November 1, 2010, upon interpreting Plaintiff's

2  cervical spine X-ray.  (AR 308.)  The radiologist noted that Plaintiff had a loss of normal cervical

3  lordosis.[5]  (AR 308.)  Plaintiff contends motor loss was shown in Dr. Sundaresan's neurological

4  examination when she found Plaintiff had weakness in her left grip and at her left hip.  (AR 320.)

5  Plaintiff argues the nerve impingement at L5 and C5-C7 noted by Dr. Sundaresan is consistent

6  with the EMG results showing denervation at those points as well as carpal tunnel syndrome.

7  Plaintiff finally argues that although a positive straight leg test and reflex loss are not noted in the

8  record, they are "likely," given the other findings in the record.  (Doc. 15, 16:7-13.)

9         The Commissioner contends there is no objective evidence to meet the elements regarding

10  limitation of motion of the spine or motor loss – thus, Plaintiff cannot establish she meets or

11  equals the elements of the Listing.  The noted cervical lordosis refers to the straightening of neck

12  vertebrae and its mere presence does not automatically mean the range of motion of the spine has

13  been impacted.  While there are notes of Plaintiff's complaints of lower back pain in Dr. Barbala's

14  treating notes, there is nothing establishing Plaintiff suffered any loss of range of spinal motion.

15  When Dr. De la Rosa reviewed the record, she specifically explained that objectively Plaintiff had

16  no loss of range of motion.  In spite of the noted lordosis, Plaintiff was able to achieve 10 METs

17  on the treadmill test, which represents vigorous physical activity, and Dr. De la Rosa opined the

18  ability to generate 10 Mets would support medium level work.  (AR 389.)  As to motor loss –

19  atrophy with associated muscle weakness – accompanied by sensory or reflex, the evidence does

20  not meet the Listing.  Although Dr. Sundaresan noted weakness in Plaintiff's left grip and hip, she

21  also noted Plaintiff had muscle tone within normal limits in all four extremities, as well as a

22  normal gait and spine, tone, coordination, and deep tendon reflexes of the upper and lower

23  extremities.  Dr. De la Rosa specifically opined that Plaintiff's records lacked clinical evidence of

24  weakness or atrophy.  In light of this medical evidence, there was no ambiguity that needed to be

25  resolved by the ALJ and no duty to develop the record further with regard to this Listing.

26

27

28
_____

[5] Plaintiff characterizes these findings as a "complete loss of lumbar lordosis," but the record cite referenced by Plaintiff refers only to a record showing "loss of normal cervical lordosis."  (AR 308.)

It is Plaintiff's burden to present evidence that she meets *all* the elements of the Listing. *Roberts v. Shalala*, 66 F.3d 179, 182 (9th Cir. 1995). The findings Plaintiff notes were considered by agency physicians, none of whom opined Plaintiff met the elements of Listing 1.04A. Although Plaintiff argues the fourth element of the Listing is met by findings made by Dr. Sundaresan showing weakness in the left grip and the left hip, these findings were interpreted by Dr. De la Rosa as more subjective than objective measures of motor-function loss. (AR 320, 389.) As the Commissioner argues, Dr. Sundaresan also found Plaintiff had tone, coordination and deep tendon reflexes of all extremities that were within normal limits showing no evidence of atrophy with associated muscle weakness as required by the Listing to establish motor-function loss. (AR 320.) In reviewing Dr. Sundaresan's findings, Dr. De la Rosa specifically noted that objectively Plaintiff did not have any findings of weakness, loss of range of motion, or atrophy. (AR 389.) Plaintiff's interpretation of a notation for motor-function weakness is not sufficient to demonstrate the Listing element is met, particularly as Dr. De la Rosa clarified these findings were more subjective than objective and found no loss of function despite Plaintiff's diagnosis for degenerative disc disease. (AR 389.) Although cervical lordosis was noted, this was not interpreted by any physician as indicating limitation of motion to the spine. Plaintiff has not established the objective findings to support every element of the Listing, and the ALJ thus did not err in finding Plaintiff did not meet the Listing 1.04A.

Although Plaintiff appears to contend there is a possibility these findings could *equal* Listing 1.04A, this argument was not presented to the ALJ at the hearing despite that Plaintiff was represented by counsel. *Lewis v. Apfel*, 236 F.3d 503, 514 (9th Cir. 2001) (finding ALJ's failure to discuss combined effect of claimant's impairments was not error, noting claimant offered no theory as to how, or point to any evidence to show, his impairments combined to equal a listed impairment).

Finally, in light of Dr. De la Rosa's opinion, which interpreted the findings made by Dr. Sundaresan, there is no ambiguity in the medical evidence for the ALJ to resolve. Plaintiff did not satisfy her burden to prove she has the objective evidence necessary to meet the requirements of the Listing, and the ALJ was not required to obtain further evidence on Plaintiff's behalf. Plaintiff

1   has not shown the ALJ erred in failing to develop the evidence whether Plaintiff met Listing

2   1.04A, particularly considering the burden of proof is carried by Plaintiff at this Step, or that the

3   ALJ erred in finding Plaintiff did not meet Listing 1.04A.

4   **D.        The ALJ Did Not Err in Failing to Find Plaintiff Disabled under the Grids**

5   Plaintiff argues the ALJ erred in failing to find Plaintiff disabled under the Medical-

6   Vocational Guidelines (the "Grids").  Although Plaintiff has a high school education, the ALJ

7   found that she was limited to simple repetitive tasks.  According to 20 C.F.R. § 416.964(b)(4),

8   someone with a high school education has the mental ability to perform semi-skilled through

9   skilled work:

> a high school education and above means abilities in arithmetic, and language skills
> acquired through formal schooling at a 12th grade level or above.  We generally
> consider that someone with these educational abilities can do semi-skilled through
> skilled work.

12   According to Plaintiff, because the RFC limited Plaintiff to simple, repetitive tasks – which does

13   not encompass semi-skilled or skilled work – she should not be considered a high school graduate

14   for purposes of applying the Grids.  Instead of considering the Grid applicable to a high school

15   graduate, the ALJ should have considered Grid 203.10 which is for individuals of advanced age

16   with limited education or less than a high school education.  Under Grid 203.10, a finding of

17   disabled is required where there is no previous work experience.

18   The Commissioner contends the ALJ properly relied upon the testimony of the VE who

19   identified alternative work someone with Plaintiff's RFC could perform – which were all unskilled

20   and matched the ALJ's RFC finding. Plaintiff's argument improperly conflates the education and

21   the RFC determination, which are *separate* vocational factors.  It is undisputed that Plaintiff has a

22   high school education.  The regulations require that unless there is evidence to the contrary, the

23   agency uses the claimant's numerical grade level to determine educational abilities – not

24   limitations set forth in the RFC.  20 C.F.R. § 416.964(b).  The mere fact the ALJ limited Plaintiff's

25   RFC to simple work does not contradict Plaintiff's high school education.  The RFC does not

26   account for educational background, but is an assessment of the most the claimant can do despite

27   the claimant's physical or mental limitations.  The RFC and education are independent factors –

28

1   not to be conflated for purposes of applying the Grids.  It was "perfectly appropriate" for the ALJ

2   to rely on the VE's testimony to find Plaintiff not disabled.

3       At Step Five, the burden of production shifts to the Commissioner to establish that the

4   claimant can perform other work that exists in significant numbers in the national economy given

5   her age, education, work experience, and RFC.  *Tackett v. Apfel*, 180 F.3d 1094, 1100-01 (9th Cir.

6   1999).  The Commissioner may meet this burden by eliciting testimony from a VE or by reference

7   to the Grids.  The Grids categorize jobs into three exertional levels, consisting of sedentary, light,

8   and medium work.  These exertional levels are further divided by the claimant's age, education,

9   and work experience.  *Id.*  The Grids direct a finding of disabled or not disabled based on the

10  number of jobs in the national economy in the appropriate exertional category.  Non-exertional

11  limitations may make the Grids inapplicable, however.  *Tackett*, 180 F.3d at 1101-02.  Non-

12  exertional limitations are non-strength related limitations that include mental, postural,

13  manipulative, sensory, or environmental limitations.  *Cooper v. Sullivan*, 880 F.2d 1152, 1155 n.7

14  (9th Cir. 1988).  In cases involving both exertional and non-exertional limitations, the Grids are

15  consulted first to determine whether a finding of disabled can be based on exertional limitations

16  alone.  *Id*. at 1155.  If so, the Grids direct a finding of disability which the Commissioner must

17  accept.  *Id.* at 1157.

18      Section 416.964(b)(4) explains that someone with a high school education generally means

19  that person will be able to perform semi-skilled through skilled work.  However, this does not

20  support Plaintiff's argument that the RFC may be used to modify other vocational factors such as

21  education level.  As argued by the Commissioner, the ALJ's consideration of a claimant's

22  education level, performed at Step Five, is a separate consideration from the RFC determination.

23  20 C.F.R. § 416.960(b), (c) ("vocational factors of age, education, and work experience" are not

24  considered at step four, but these factors are considered at step five – *in addition* to the RFC

25  determination used at Step Four to determine if a claimant can adjust to other work.)

26      Plaintiff cites *Distasio v. Shalala*, 47 F.3d 348 (9th Cir. 1995) for the proposition that the

27  Grids must not be applied mechanically but as a framework for decision.  The Court is not

28  persuaded that *Distasio* has analogous application to this case.  In *Distasio* the VE testified the

claimant was limited to work within the sedentary category, which was accepted by the ALJ.  In reaching the disability decision, however, the ALJ determined the claimant was *not* limited to sedentary work and applied the Grids with an exertional limitation for light work, rather than sedentary work.  The appellate court concluded the ALJ accepted the VE's testimony that Plaintiff was limited to sedentary work and was thus required to apply the Grid related to sedentary exertional limitations rather than the Grid for light exertional limitations.  Here, in formulating the RFC the ALJ found Plaintiff could perform medium level exertional work, but she was limited to simple job instructions at Step Four of the sequential evaluation.  (AR 16.)  At the hearing, the VE testified to jobs Plaintiff could perform at a medium exertional level, which were all unskilled.  In reaching a decision at Step Five, the ALJ first consulted the Grids based only on Plaintiff's exertional limitations, age, and education which directed a finding of not disabled.  The ALJ then considered the RFC and the testimony from the VE incorporating all relevant non-exertional limitations indicating there was alternative work Plaintiff remained able to perform.  The ALJ's analysis was legally sufficient.  *Distasio* does not provide support for the proposition the ALJ may alter the prescribed vocational factors considered in the Grids at Step Five based on the RFC assessment at Step Four.

### CONCLUSION

Based on the foregoing, the Court finds that the ALJ's decision is supported by substantial evidence in the record as a whole and based on proper legal standards. Accordingly, the Court DENIES Plaintiff's appeal from the administrative decision of the Commissioner of Social Security.  The Clerk of this Court is DIRECTED to enter judgment in favor of Defendant Carolyn W. Colvin, Acting Commissioner of Social Security and against Plaintiff Carolyn Hunt.

IT IS SO ORDERED.

Dated:   **March 16, 2015**                         **/s/ Sheila K. Oberto**
                                                  UNITED STATES MAGISTRATE JUDGE